UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEFA HERNANDEZ BERNAL, <br> Plaintiff, <br> v. <br> SERGIO ALBARRAN, et al., <br> Defendants. | Case No. 25-cv-09772-RS <br><br> **ORDER GRANTING PRELIMINARY INJUNCTION** |

Petitioner Josefa Hernandez Bernal is an undocumented immigrant from Venezuela. On November 13, 2025, she was detained by Immigration and Customs Enforcement ("ICE") officers in San Francisco during a routine immigration check-in. Bernal filed a petition for a writ of habeas corpus against various government officials, seeking immediate release from custody and a prohibition on her rearrest. *See* Dkt. 1. Bernal successfully obtained a temporary restraining order, and she now seeks a preliminary injunction. Because Respondents lack a permissible basis on which to detain Bernal, the request for a preliminary injunction is granted.

**I. INTRODUCTION**

Josefa Hernandez Bernal is a native and citizen of Venezuela. In June 2024, she unlawfully entered the United States without inspection and was apprehended by federal agents near the southern border. About one month later, she was released on her own recognizance. In July 2024, Bernal was placed into removal proceedings under 8 U.S.C. § 1229a via the filing of a Notice to Appear.

On November 13, 2025, Bernal travelled to the ICE Field Office in San Francisco for a

regular check-in. Instead of proceeding with the check-in, ICE officers arrested her. Bernal promptly filed a petition for a writ of habeas corpus and a motion for a temporary restraining order. The petition argues that her detention violates the Due Process Clause of the Fifth Amendment to the United States Constitution. That is because, in Bernal's view, at the moment she was released on her own recognizance by federal agents, she developed a liberty interest that could not be impinged without sufficient process. *See Mathews v. Eldridge*, 424 U.S. 319 (1976).

Bernal's motion for a temporary restraining order was granted, and Respondents were ordered to show cause why a preliminary injunction should not issue. In their papers, Respondents contend that Bernal is subject to mandatory detention under 8 U.S.C. § 1225(b)(2)(B) during the pendency of her removal proceedings. In the alternative, Respondents argue that Bernal was validly re-detained pursuant to the Attorney General's discretionary detention authority, *see* 8 U.S.C. § 1226(a), because she committed three violations of her release requirements. *See id.* § 1226(b) ("The Attorney General at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien.").

In Respondents' view, the existence of valid statutory authority to detain Bernal resolves her Due Process challenge. That is, Respondents claim that Bernal has received all the process Congress thought due, and the Fifth Amendment requires nothing more. *See Mathews v. Diaz*, 426 U.S. 67, 79–80 (1976) ("In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens.").

## II. LEGAL STANDARD

A party seeking a preliminary injunction must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). "[I]f a plaintiff can only show that there are serious questions going to the merits – a lesser showing than likelihood of success on the merits – then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Friends of the Wild*

*Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (internal quotation marks and citations omitted). "[W]hen the Government is the opposing party," the final two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## III. DISCUSSION

### A. Likelihood of Success on the Merits

#### a. Due Process

Bernal challenges her detention under the Due Process Clause of the Fifth Amendment. The Due Process Clause protects all persons within the United States from being "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Due Process Clause applies equally to noncitizens unlawfully present in the United States, like Bernal. *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

Though Bernal's claim is ultimately constitutional, it turns on an antecedent statutory question. Namely, does either section 1225(b) or section 1226(a) provide a valid basis to detain her? Only if the answer is yes does Bernal's Due Process claim crystalize. That is, only in that scenario is it necessary to determine the precise scope of Bernal's asserted liberty interest and whether the statutory detention authority provides Bernal with constitutionally sufficient process. However, if the answer is no, Bernal's Due Process claim reduces to a much simpler proposition: Respondents cannot detain her without a legal basis to do so, and the preliminary injunction must issue.

#### i. Mandatory Detention Under 8 U.S.C § 1225(b)(2)(A).

Respondents invoke two statutory bases to detain Bernal. The first, and the one on which they rely most heavily, is 8 U.S.C. § 1225(b)(2)(A). In relevant part, that provision provides:

> [I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

8 U.S.C. § 1225(b)(2)(A). There is no real dispute that Bernal is "an applicant for admission" who is not "clearly and beyond a doubt entitled to be admitted." *Id.* The controversy, instead, is over

whether she is "an alien seeking admission" within the meaning of the statute.

Bernal cites a legion of district court cases, including several from this district, holding that a noncitizen released into the interior of the country pending deportation proceedings is not "seeking admission." *See, e.g.*, *Valencia Zapata v. Kaiser*, 2025 WL 2741654, at *10 (N.D. Cal. Sept. 26, 2025); *Salcedo Aceros v. Kaiser*, 2025 WL 2637503, at *9 (N.D. Cal. Sept. 12, 2025); *Lopez Benitez v. Francis*, 2025 WL 2371588, at *7 (S.D.N.Y. Aug. 13, 2025). The decisions tend to lead with a two-part analysis of the plain text.

The first part of the analysis focuses on the word "admission." The insight is that it is unnatural to think of someone who is in the interior of the country as seeking "admission" because admission is something acquired upon initial entry. As one district court observed:

> [S]omeone who enters a movie theater without purchasing a ticket and then proceeds to sit through the first few minutes of a film would not ordinarily then be described as "seeking admission" to the theater. Rather, that person would be described as already present there. Even if that person, after being detected, offered to pay for a ticket, one would not ordinarily describe them as "seeking admission" (or "seeking" "lawful entry") at that point—one would say that they had entered unlawfully but now seek a lawful means of remaining there.

*Lopez Benitez*, 2025 WL 2371588, at *7; *see Salcedo Aceros*, 2025 WL 2637503, at *10 (adopting that analysis).

While that might be right in the case of the nonpaying moviegoer, there is good reason to think it is wrong in immigration law. For one, section 1225 contemplates "admission" as something that a noncitizen can lack even when within the borders of the United States. Section 1225(a)(1) defines an "applicant for *admission*" as, in part, "[a]n alien *present in the United States* who has not been admitted." 8 U.S.C. § 1225(a)(1) (emphasis added). If, as these district courts suggest, "admission" is not something a person needs once they are "present in" the place they want to be, that definition would make no sense. Instead, it appears that at least in section 1225, "admission" is a term of art, and one can logically be "seeking" it from within the interior of the country.

The remainder of the Immigration and Nationality Act ("INA") suggests as much. 8 U.S.C. § 1101 defines "admission" to mean, "with respect to an alien, the lawful entry of the alien into the

United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). That definition goes on to identify certain classes of noncitizens that are not "considered to have been admitted" despite being physically present in the United States. *See, e.g.*, *id.* § 1101(a)(13)(B) (aliens paroled under 8 U.S.C. § 1182 not considered to have been admitted). That leaves individuals in those classes in precisely the position that these various district courts thought impossible: in the interior of the United States, yet lacking admission. *See also Matter of Lemus-Losa*, 25 I. & N. Dec. 734, 747 n.6 (BIA 2012) ("[A]ny alien who applies for admission to the United States after accruing a prior period of unlawful presence is, in a very meaningful (if sometimes artificial) sense, '*again* seek[ing] admission.'" (emphasis in original)).

The second component of the textual analysis focuses on the word "seeking." The district courts to have adopted this argument emphasize that "seeking" is an active verb, and they conclude that someone merely present in the interior of the country is not doing anything active with regard to her admission status. *See Lopez Benitez*, 2025 WL 2371588, at *6 ("[T]he active construction of 'the phrase "seeking admission,"' though undefined in § 1225(b)(2)(A), 'necessarily implies some sort of present-tense action.'") (quoting *Martinez v. Hyde*, 792 F. Supp. 3d 211, 218 (D. Mass. 2025)). This too leaves something to be desired. Even if those decisions are correct that "seeking" requires something active, it is far from obvious that noncitizens like Bernal are not doing something active while in the United States. Bernal has an open application for asylum. That requires her to fill out forms, attend hearings, and go to ICE check-ins, all in service of securing legal status in the United States. She is unquestionably active when she is doing those things, and it cannot be the case that she oscillates between "seeking admission" and not depending on whether, in that precise moment, she is completing one of the steps required to obtain asylum.

Here again, the other portions of the INA cast doubt on Bernal's argument. Section 1101 provides that lawful permanent residents shall not be regarded as "seeking admission" *unless* they do certain things, such as abandon that status or commit a specified offense. *See* 8 U.S.C. § 1101(a)(13)(C). These individuals are, presumably, doing nothing more than filling out forms,

giving interviews, and attending hearings, yet under the statute, that is sufficiently active for them to be "seeking admission." It is therefore unclear why Bernal—who is doing many of the same things—is not active enough to be "seeking admission" within the meaning of the statute.

The district court decisions favorable to Bernal also tend to invoke the rule against surplusage. They explain that the group of those "seeking admission" must be smaller than those that are "applicant[s] for admission" because, were it otherwise, the former would serve no purpose. *See Salcedo Aceros*, 2025 WL 2637503, at *9; *United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432 (2023) ("[E]very clause and word of a statute should have meaning."). This is a stronger argument. At the very least, unless those two phrases have different meanings, Congress's choice of words is odd. Consider the repeated use of the article "an" in the statute. *See* 8 U.S.C. § 1225(b)(2)(A) ("[I]n the case of an alien who is *an* applicant for admission, if the examining immigration officer determines that *an* alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.") (emphasis added). "An" is typically used when a statute is referring to a person that has not already been identified. If, in section 1225(b)(2)(A), the "alien seeking admission" is always the same person as the "applicant for admission," it would have been much more natural for Congress to refer to that alien as "*the* alien seeking admission." Better yet, Congress could have just used the term "the applicant," or "he or she." That it did not suggests that it meant the statute to cover an individual that meets two different definitions—(1) "an applicant for admission" and (2) someone "seeking admission."

Notwithstanding this rather strange language, Respondents argue that a separate provision of section 1225 confirms that "applicant for admission" and "seeking admission" are coextensive. Namely, section 1225(a)(3) provides that "[a]ll aliens . . . who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers." Respondents contend that the phrase "or otherwise" is used when the preceding term is one example of the broader succeeding term. For instance, in a statute penalizing "lying, misleading, or otherwise attempting to obscure the truth," "lying" and

ORDER GRANTING PRELIMINARY INJUNCTION
CASE NO. 25-cv-09772-RS

6

"misleading" are merely prominent examples of the thing the statute is really proscribing: "attempting to obscure the truth." Applied here, that logic suggests that an "applicant for admission" is merely one kind of noncitizen "seeking admission," which would mean the use of the phrase "seeking admission" in section 1225(b)(2) carries no additional meaning.

There is some support for that proposition. *See Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 963 (11th Cir. 2016) (en banc) ("By using 'or otherwise' to join the verbs in this section, Congress made [the preceding verbs] a subset of [the succeeding verbs]."). Respondents' argument would, however, be far more persuasive if the phrase "or otherwise" were used in the statutory provision that authorized mandatory detention, section 1225(b)(2)(A). In section 1225(b)(2)(A), Congress felt the need to cabin the application of mandatory detention to only those "seeking admission" *after* it already limited the provision's scope to "applicants for admission." In that context, therefore, it is far from obvious that Congress intended the two terms to be completely coterminous.

As should now be apparent, the textual question is knotty. Fortunately, the remainder of the statutory scheme provides probative evidence of Congress's intent, which resolves the interpretive question in Bernal's favor. First, in January 2025, Congress amended the provision governing discretionary detention—8 U.S.C. § 1226—to add an additional category of noncitizens subject to mandatory detention. *See* Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025). "This category includes noncitizens who are (1) inadmissible under 1182(6)(A) [present without admission or parole], (6)(C) [misrepresentation], or (7)(A) [lack of proper documentation] *and* (2) have been charged with one of certain enumerated crimes." *Salcedo Aceros*, 2025 WL 2637503, at *10. Under Respondents' view, however, this class of individuals was *already* subject to mandatory detention under section 1225(b)(2)(A) because they satisfy the statutory definition of "applicants for admission." Therefore, adopting Respondents' theory would be to presume Congress intended its amendment to have "[no] real and substantial effect"—a presumption the Supreme Court has admonished is appropriate. *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995).

Respondents acknowledge this redundancy but contend that Congress sometimes enacts

ORDER GRANTING PRELIMINARY INJUNCTION
CASE NO. 25-cv-09772-RS

7

overlapping laws to be "doubly sure" that it has accomplished its goals. *Barton v. Barr*, 590 U.S. 222, 239 (2020). To demonstrate that is what Congress did here, Respondents cite some legislative history indicating that Congress enacted the Laken Riley Act because the executive had been ignoring its duty under the Constitution to defend its citizens. If anything, that cuts against them. This legislative history shows Congress (or rather, one member of Congress) thought the Laken Riley Act was necessary to constrain executive discretion. That would only be necessary if the executive previously *had* discretion—a position at odds with Respondents' current construction of section 1225(b)(2)(A).

Moreover, section 1225(b)'s implementing regulations suggest that it was not intended to sweep as broadly as Respondents claim. 8 C.F.R. § 235.3(c)(1) provides that section 1225(b) shall apply to "any arriving alien" that appears inadmissible and is placed in standard removal proceedings. By limiting the scope of section 1225(b) in this way, the regulation effectively defines an "applicant for admission" who is "seeking admission" to be an "arriving alien"—a definition that would exclude those like Bernal who are now in the interior of the country. If Respondents are correct that Congress meant for section 1225(b) to apply more broadly all along, it could have corrected the Secretary. It did not.

Respondents' construction of the statute would also seem to shrink the discretionary detention provision, section 1226, beyond recognition. Section 1226 provides that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed." 8 U.S.C. § 1226(a). That provision also permits the Attorney General to "release the alien . . . on conditional parole." *Id.* § 1226(a)(2)(B). The implementing regulations permit an ICE officer to release the alien in the officer's discretion "provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceedings." 8 U.S.C. § 236.1(c)(8).

For many years, the understanding—shared by the Executive and the Supreme Court—was that section 1226, not section 1225, governed immigration arrests conducted within the interior of

ORDER GRANTING PRELIMINARY INJUNCTION
CASE NO. 25-cv-09772-RS

8

the United States. *See* 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997) ("Despite being applicants for admission, aliens who are present without having been admitted or paroled . . . will be eligible for bond and bond redetermination."); *Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018) ("In sum, U.S. immigration law authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain aliens *already in the country pending the outcome of removal proceedings* under §§ 1226(a) and (c).") (emphasis added). Respondents' construction of the statute would wreak havoc on this shared understanding. Their view is that virtually every noncitizen in the interior of the country is both an "applicant for admission" and is "seeking admission," making all of them subject to mandatory detention under the statute. Because a noncitizen cannot simultaneously be subject to mandatory detention and discretionary detention, the result is that section 1226 will apply only to an extremely small group of noncitizens: those present in the United States who have been admitted but who now lack legal status. *See, e.g.*, *Jennings*, 583 U.S. at 289–90. The statutory scheme is devoid of any indication that Congress meant for section 1226 to be that narrow.

In sum, section 1225(b)(1)(A) does not supply statutory authority to detain Bernal.

### ii. Discretionary Detention under 8 U.S.C. § 1226(a)

Though most of Respondents' submission is dedicated to arguing that Bernal was properly detained under section 1225(b), they make a half-hearted attempt to justify Bernal's detention under section 1226(a). Section 1226(a) provides that an "alien may be arrested and detained pending a decision on whether the alien is to be removed." It further provides that the Attorney General "may continue to detain the arrested alien" or "may release the alien on a bond . . . or conditional parole." 8 U.S.C. § 1226(a).

Respondents contend they properly exercised their authority to detain Bernal under section 1226(a) because she violated the terms of her release. Respondents have submitted the declaration of Deportation Officer Michael Silva, the agent assigned to Bernal's case. *See* Dkt. 8, Ex. 1 (Silva Decl.). Officer Silva declares that Bernal violated the terms of her release three times: once by failing to complete a self-report check-in on November 19, 2024, and twice by being outside of an

ORDER GRANTING PRELIMINARY INJUNCTION
CASE NO. 25-cv-09772-RS

approved zone on February 11, 2025, and July 25, 2025. *See id.*, at 2.

This justification is problematic. Respondents style these incidents as violations of the terms of Bernal's release, but the release documents do not seem to contain the requirements Bernal allegedly violated. Nothing in the Order of Release on Recognizance, Dkt. 8, Ex. 2, sets out an "approved zone." Bernal did agree to participate in an Alternatives to Detention program which required submission to electronic monitoring, but Respondents provide no detail about the restrictions—if any—required by that program. For her part, Bernal denies any knowledge of a geographic restriction and denies leaving California since arriving in the United States. *See* Dkt. 13, Ex. 1 ¶ 6. The other alleged violation is equally unsubstantiated. Though Bernal admits to being required to check in with the government through an app, she denies ever having missed a check-in or having been told by her caseworker that she was noncompliant. *See id.*, ¶ 4. Without any additional detail, there is simply not enough support for Respondents' assertion that Bernal breached the terms of her release.

The timing of the alleged violations casts further doubt on Respondents' asserted justification. Bernal supposedly committed three violations—one a full year ago, one more than nine months ago, and one almost four months ago. Why, if these violations rendered Bernal unworthy of remaining on release pending the adjudication of her removal proceedings, did Respondents wait this long to rearrest her? And why did the warrant simply allege removability instead of clarifying that she was being detained for failure to comply with her release conditions? *See* Dkt. 8, Ex. 4 (Warrant for Arrest of Alien). Respondents have no answers.

Even if Respondents' allegations that Bernal violated her release conditions were credited, her detention would remain improper. Section 1226(a)'s implementing regulations require release of a detained noncitizen unless the noncitizen poses a danger to the community or is a flight risk. *See Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1196–97 (9th Cir. 2022). When the noncitizen is initially detained, 8 C.F.R. § 236.1(c)(8) provides for release if the noncitizen "demonstrate[s] to the satisfaction of the [ICE] officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." *See id.* If the ICE officer

ORDER GRANTING PRELIMINARY INJUNCTION
CASE NO. 25-cv-09772-RS

determines that the noncitizen should not be released, the regulations permit the noncitizen to request a bond hearing before an immigration judge at any time before a removal order becomes final. *See* 8 C.F.R. §§ 236.1(d)(1), 1003.19; *Rodriguez Diaz*, 53 F.4th at 1197. In this hearing, too, the inquiry is whether the noncitizen is "a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk." *In re Guerra*, 24 I. & N. Dec. 37, 40 (BIA 2006). Though the immigration judge may "consider[] various factors in making this determination, including the individual's ties to the United States as well as his employment history, criminal record, history of immigration violations, and manner of entry into this country," those factors are considered to assess dangerousness and flight risk. *Rodriguez Diaz*, 53 F.4th at 1197.

The upshot of these regulations is that detention is permitted under section 1226(a) only if Bernal is dangerous or a flight risk. Respondents have not come close to showing that, and in fact, have hardly even tried. Though they point to minor, technical violations, they have not explained how those violations make Bernal dangerous or a flight risk. That is probably because, of course, they do not. Bernal is a sixty-year-old grandmother of seven with no criminal history that has appeared for every immigration hearing she has been required to attend. *See* Dkt. 13, Ex 1 (Bernal Decl.), at *2. The three alleged release condition violations (even if credited) do not change that.

As explained, the determination that Bernal's detention is not authorized under section 1225(b)(2)(A) or section 1226(a) resolves her Due Process claim. There is no need to delineate when her liberty interest arose or what the scope of that liberty interest now is because the government may *never* detain an individual that enjoys the protection of the Due Process Clause without a legal basis to do so.

**B. Remaining Preliminary Injunction Factors**

The remaining preliminary injunction factors—irreparable harm, the balance of equities, and the public interest—decidedly weigh in favor of Bernal. As explained in the order granting a temporary restraining order, illegal detention is an unquestionably serious impingement on an individual's constitutional rights. By successfully demonstrating that Respondents lack a basis to

1   detain her, she has succeeded in showing irreparable harm.

2   The final two factors—which merge here because the government is the opposing party—
3   tip the same way. While the government has a compelling interest in enforcing the immigration
4   laws, granting relief to Bernal will not seriously impinge its ability to do so. The government has
5   already placed Bernal in full removal proceedings under section 1229a, and nothing in this order
6   will delay its ability to prosecute her removal. Moreover, this order does not preclude the
7   government from detaining Bernal if it can convince a neutral arbiter that she is subject to
8   detention under section 1226(a)—that is, that she is dangerous or a flight risk. Therefore, at worst,
9   this order imposes a minor delay on the government's execution of the immigration laws.

10  All that remains to be decided is the scope of relief. Respondents request that relief be
11  limited to ordering a post-detention bond hearing. Concededly, that is what section 1226(a)'s
12  implementing regulations contemplate. However, courts have routinely mandated a bond hearing
13  before detention in cases, like this one, in which the government has utterly failed to offer
14  evidence that the noncitizen is a danger to the community or a flight risk. *See, e.g.*, *Salcedo*
15  *Aceros*, 2025 WL 2637503, at *12. That is appropriate here.

16  As at the temporary restraining order stage, there is no need to require the filing of a bond.
17  *See* Fed. R. Civ. P. 65(c). "[T]here is no realistic likelihood of harm to [Respondents] from
18  enjoining [their] conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). Therefore,
19  no security is needed to ensure that respondents will be reimbursed for "costs and damages
20  sustained by . . . hav[ing] been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

### IV. CONCLUSION

22  For the foregoing reasons, Bernal's request for a preliminary injunction is granted.
23  Respondents are enjoined and restrained from:
24     (1) Re-detaining Bernal without a pre-deprivation hearing before a neutral decisionmaker.
25     (2) Transferring Bernal outside of the Northern District of California or deporting her for
26        the duration of these proceedings.

**IT IS SO ORDERED**.

Dated: November 25, 2025

_____
RICHARD SEEBORG
Chief United States District Judge